# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-00067-SCT

*STEVE ALLEN, HARRY ALLEN, AND HUNTER
ALLEN*

*v.*

*STEVEN FEATHERSTONE DICKERSON AND
ALYSON LEE DICKERSON, INDIVIDUALLY AND
AS NEXT BEST FRIEND FOR MINOR
CHILDREN, G.D. AND E.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/16/2022 |
| TRIAL JUDGE: | HON. STEPHEN TRAVIS BAILEY |
| TRIAL COURT ATTORNEYS: | GREG E. BEARD |
| | LAURANCE N. C. ROGERS |
| | JESSE DALE HUSKE |
| COURT FROM WHICH APPEALED: | PRENTISS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | JESSE DALE HUSKE |
| ATTORNEY FOR APPELLEES: | GREG E. BEARD |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 05/23/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Two long-standing but competing interests are at issue in this case: the right to the quiet enjoyment of property versus the right to hunt and harvest wildlife. The trial court found that the repeated intrusion of deer hunting dogs onto neighboring landowners' property resulted in a private nuisance and granted permanent injunctions disallowing the hunting dogs from going onto the property. Because the trial court's findings were supported by

sufficient evidence, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    Steven Featherstone Dickerson (Steven) and Alyson Lee Dickerson (collectively, the Dickersons) own approximately 220 acres in Booneville, Mississippi. The Dickersons bought the property in 2010 and have resided there since 2012. The Dickersons engage in "still hunting" deer on their property.[1] Steven also is a member of Burton Hunting Club.

¶3.    Steve Allen (Steve), Harry Allen, Hunter Allen (collectively, the Allens), and Michael Cain[2] are members of Sand Hill Hunting Club and lease or have permission to hunt approximately nine hundred acres located approximately a mile and a half from the Dickersons' nearest property line. The Allens, Cain, or Sand Hill Hunting Club have leased the property for around forty years. The Allens and Cain engage in deer hunting with dogs during the appropriate dog hunting season.[3]

¶4.    Burton Hunting Club's leased property directly borders the leased property of Sand Hill Hunting Club. Although Burton Hunting Club allowed hunting deer with dogs at one time, it no longer allows it. Thus, Sand Hill is the closest hunting club to the Dickersons'

---

[1]Still hunting is when a hunter uses a tree stand or blind to wait for game to appear in the sight of the hunter or when a hunter slowly walks through the woods.

[2]Although Michael Cain was an original defendant, he is not a party to the appeal.

[3]The deer hunting with dogs season is thirty-nine days of the year, broken into two blocks. *See* Miss. Code Ann. § 49-7-31 (Rev. 2012). Generally, dog hunting season will open approximately November 18 through December 1. It then reopens around December 24 through January 17. *Id.*

2

property that engages in hunting deer with dogs.

¶5.    The Allens' hunting dogs are generally equipped with Global Positioning System (GPS) tracking collars, and the hunters have handheld receivers. Pictured on the receivers are maps that show both the hunters' locations and the dogs' locations. A hunter can set the receiver to update between every two minutes to every three seconds, and the GPS collars allow the hunters to know where a dog is within three feet.

¶6.    To begin a dog hunt, a hunter will release deer dogs in a chosen location on the property that they lease, generally somewhere in the center of the property on one of their hunting roads. The hunters then use public roads to try to position themselves ahead of where they think the dogs will run a deer out. Ideally, a deer hunt with dogs begins with the dogs jumping a deer on the property that they have permission to hunt and ends with a deer being taken on the same property. Often, however, a deer hunt will begin the same way, but the dogs will chase a deer onto property that the Allens do not have permission to hunt. When this occurs, the Allens use public roads to try to catch the dogs, including the public road by the Dickersons' property.

¶7.    In August 2020, after years of confrontations between the Dickersons and the Allens and Cain, the Dickersons, and on behalf of their minor children, G.D. and E.D., filed a complaint against the Allens and Cain.[4] The Dickersons alleged that the Allens' and Cain's

_____

[4]This was not the first action filed between the parties. Following an altercation on January 18, 2020, Steven filed suit against Steve in the Lee County Justice Court for trespassing. Shortly afterward, Hunter filed suit against Steven for simple assault. The trial

3

hunting dogs trespass on their property, that the Allens and Cain line the county road waiting on the dogs to run deer across the road, and that the Allens and Cain fire weapons in close proximity to the Dickersons' property. The Dickersons additionally alleged that the deer dogs interfered with the Dickersons' preferred method of still hunting. The Dickersons argued that the Allens' actions amounted to nuisance and sought injunctions that would require the Allens to keep their dogs off of the Dickersons' property and to prevent the Allens from stopping, parking, or walking on any road right-of-way that joins the Dickersons' land. The Dickersons additionally requested a money judgment in an unspecified amount to reimburse them for the Allens' disturbance of the quiet and peaceful enjoyment of their land.

¶8. Trial commenced on September 21, 2022, and eight witnesses testified. First, Taylor Walker, a narcotics investigator with the Prentiss County Sheriff's Department at the time of trial, testified that he had been a deputy sheriff in the area from 2013-2020. Investigator Walker testified that in 2018 or 2019 he had received approximately ten or more calls from the Dickersons regarding hunting dogs on their property. He stated that the Dickersons usually identified particular individuals as being the owners of the dogs, that it was usually someone in the Sand Hill Hunting Club, and that it was usually Cain. Investigator Walker testified that receiving calls from the Dickersons complaining about Sand Hill Hunting Club

court found the defendants not guilty on each charge. Cain also has accused Steven of hunter harassment. The charges went to trial on June 30, 2021, and, after the close of evidence, the justice court granted the defendant's motion to dismiss. Steven then sued Cain for wrongful prosecution, which was still in litigation at the time of trial.

members was a fairly frequent occurrence.

¶9. Investigator Walker testified that he had never witnessed the Allens or Cain violate any law of the state of Mississippi. According to Investigator Walker, when he received a complaint from the Dickersons, he would arrive at the location and would typically see one of the Allens or Cain parked on the side of the county road that adjoins the Dickersons' property. Investigator Walker testified that the Allens were not violating any law by parking on the side of the road. Investigator Walker testified that he typically could hear the dogs running when he arrived. When he asked the Allens or Cain what they were doing, he stated that they normally responded that they were not hunting but were just trying to collect their dogs. Investigator Walker had never issued any tickets to the Allens or Cain. He also testified that when he encountered the Allens or Cain on the public roads, he had never made any observations that discredited their statements that they were simply gathering their dogs.

¶10. James T. Gholson, a conservation officer with the Mississippi Department of Wildlife, Fisheries, and Parks (MDWFP), testified that it is legal to hunt with dogs in Mississippi. He testified that there are no laws that require a dog hunter to have a correction or shock collar and no laws that require a deer dog to be specially trained.

¶11. Officer Gholson referred to the area as a "hot spot" for deer hunting with dogs. He testified that, in 2019, the MDWFP sent additional game wardens to the area due to multiple calls from multiple landowners regarding dog running within the area of County Road 3401 to 3501. The additional wardens were not called solely because of Sand Hill Hunting Club.

5

The Pepper Patch Hunting Club, Burnt Schoolhouse Hunting Club, and Altitude Hunting Club were clubs in the area that also hunted deer with dogs. Officer Gholson stated that it was very common for dog hunters to use public roads to gather their dogs if they did not have a private road. As long as a hunter is wearing orange and the hunter's gun is unloaded, it is not illegal for a hunter to park on the side of the road and wait for his dogs to come to him.

¶12.    Officer Gholson testified that approximately two to three times a season, there would be encounters that required his presence between the Dickersons and the Allens or Cain. Officer Gholson stated that he had encountered the Allens on the side of the public roads. During those occasions, the Allens indicated that they were either listening or watching their GPS for their dogs. Officer Gholson testified that he could not give the Allens a citation for running dogs on the property belonging to the Dickersons and that no statute would prohibit the Allens from running their dogs on the Dickersons' property. He could not recall issuing any written tickets to the Allens. When asked whether running dogs across land disturbs game that is on that land, Officer Gholson responded that it could.

¶13.    Each of the Allens and Cain maintain full-time jobs with normal business hours year round. Cain, a city of Booneville gas and water department employee, stated that he was allotted fifteen days of vacation a year and that he used most of those days during hunting season. He testified that he had been hunting deer with dogs for approximately forty years and that people had always hunted with dogs in that area. Cain estimated that they use approximately three or four dogs during a hunt. Cain used GPS collars on his dogs when he

6

hunted and had recently acquired collars with correction capabilities. With the correction capabilities, Cain can send a tone to the collar, and the dog is supposed to come back to him when the dog hears the tone. If the dog does not come back after hearing the tone, the second phase is to administer a shock.

¶14.    Cain testified that, when the dogs are released, they do their best to keep the dogs on property on which they have permission to hunt. Even so, he stated the dogs go wherever the deer go, and there is no way to know which way the dogs will go before they are released. Cain estimated that his dogs left Sand Hill property five out of ten times. He testified that there was no way to call a hunting dog off of a trail if the dog is running a deer because the dog will not stop. Cain testified that most of his dogs were already trained when he got them and that they "partially" responded to commands.

¶15.    Cain testified that the confrontations with Steven had been ongoing for approximately five to six years. He stated that he had never stepped foot on the Dickersons' land and, if his dogs went onto the Dickersons' property, he would wait for the dogs to come out. Cain also stated that he had never witnessed anybody releasing their dogs onto the Dickersons' property. Further, Cain testified that he had not had any negative experiences with other landowners and that, although his dogs had gotten onto other people's properties, they had not gotten mad about it.

¶16.    Cain testified that he no longer owns deer dogs because he had "been harassed by [the Dickersons' attorney] and [Steven] so much" that he sold them. Cain testified that he had no

plans to continue deer hunting with dogs.

¶17. Harry Allen, a constable in Prentiss County, was seventy-nine years old at the time of trial. He testified that he had been hunting the area for approximately thirty to forty years. He stated that he had not hunted in the past three years, however, and had not killed a deer in four or five years. Harry does occasionally ride around when other people hunt and listen to the dogs run. Harry had never been cited for a hunting violation.

¶18. Harry testified that his deer dogs also have GPS collars but not correction collars. Harry testified that he had never released a dog on the Dickersons' property and that he did not want his dogs to go on the Dickersons' property. He stated that Steven had called him once and told him that he had caught Harry's dog, and Harry went to Steven's property to get his dog.

¶19. Steve, an employee with the Mississippi Department of Transportation, testified that he had been dog hunting with Sand Hill for approximately twenty years. He also stated that he had never been ticketed for a game and fish violation.

¶20. Steve testified that he had never intentionally let a dog run onto the Dickersons' property. He testified that his dogs have GPS collars and corrective collars. He stated that the corrective collars made a huge difference, but there was not a way to ensure 100 percent that a dog would never step foot on the Dickersons' property again. Steve also testified that if you use a shock collar too much on a dog, the dog will be afraid to do anything because he would associate running deer with pain. Steve agreed with Cain that when he turns his dogs loose,

there is a 50 percent chance that the dogs will go off of the land that Sand Hill leases. Steve also testified that there were many more residences in the area now as compared to when they first began using dogs to hunt deer.

¶21.    Hunter Allen, president of the Sand Hill Hunting Club, testified that he worked for the United States Department of Agriculture Natural Resources Conservation Service. Hunter also had never been issued a ticket for violating game and fish laws.

¶22.    Hunter has GPS and corrective collars on his deer hunting dogs. In response to the trial court's questioning about how he attempts to prevent the dogs from leaving the leased property, Hunter stated that they usually tried to cover all the known crossings where deer prefer to cross. Yet he stated that if a deer comes to a crossing and sees a truck or smells or hears a hunter, the deer will turn and whirl and shoot out at a random place. Hunter testified that when the dogs are pursuing game, the only way to stop them is if a hunter is in close proximity. He stated that if he shocked a hunting dog while the dog was in pursuit of a deer and the dog could not see him, it would ruin the dog, and the dog might not ever hunt again.

¶23.    Hunter testified that, most of the time, his dogs do not leave Sand Hill's leased property. He estimated that his dogs leave the leased area around 5 to 10 percent of the time at most. Hunter stated that his dogs had only been on the Dickersons' property once or twice since he has been dog hunting. He estimated that the entirety of Sand Hill Hunting Club's dogs go on the Dickersons' property five times a year.

¶24.    Alyson Dickerson, a nurse anesthetist at Baptist Hospital in Booneville, testified that

they own 220 acres. The Dickersons began living at 149 County Road in Booneville, Prentiss County, in 2012. Alyson's parents also have sixty acres adjoining their land. According to Alyson, problems with the Allens and Cain began in 2012. She had never spoken with the Allens or Cain, however, had never had any encounters with them, and had never seen them step foot on her property.

¶25.    Alyson testified that she has seen dogs running on her property multiple times a year and that other hunting clubs are not as big of a problem as the Allens and Cain. Alyson testified that every year she sees the Allens and Cain stopped on the right-of-way on property adjoining the Dickersons' land. She stated that she sees one of the Allens or Cain almost every day during dog hunting season. She stated that she also hears gunshots from her house and attributes that to people hunting deer with dogs. Alyson stated that the noises put her in fear for the safety of her children. Alyson had never witnessed the Allens or Cain discharge a firearm but stated that she had seen them shortly after hearing a gunshot. Alyson testified that she could not put a dollar amount on her claim for disturbing the quiet and peaceful enjoyment of her land.

¶26.    Steven testified that the property on which their house sits had previously been part of the Burton Hunting Club's property. Steven stated that he was aware he was building a house in a rural hunting area and that he knew the area was historically a dog hunting area.

¶27.    He testified that he could not say how many times he would encounter the Allens and Cain on an annual basis but that it was often. Steven stated that he still hunts and that deer

10

dogs have interrupted his hunts too many times. Steven testified that, most of the time, he would stop his hunt and go to the county road and would see the Allens or Cain catching their dogs. Steven agreed that the confrontations between him and the Allens and Cain had escalated over the years.

¶28.    Steven stated that most of the time, the dogs did not get close enough for him to physically catch them but that he was able to physically catch the Allens' or Cain's dogs on his property two to four times a year. When this happened, he would call the dog's owner and hold the dog until the owner was able to retrieve it. Steven stated that he had no problems with any of the other dog running clubs.

¶29.    Steven testified that he prepared his land and tried to improve his land for wildlife every day of the year. He usually planted fruit trees and food plots and fixed roads. He testified that he spent $4,000 in fertilizer and feed for his food plots the previous year. Steven stated that when hunting dogs come through his property, it interferes with his ability to hunt his property. Steven said a monetary fine might get Cain's and the Allens' attention and that they might start to try harder.

¶30.    The trial court found that the Allens' dogs had regularly interfered with the Dickersons' peaceful and quiet enjoyment of their private property. The trial court additionally found that no adequate remedy at law existed because damages for a lost day or half day of hunting would be difficult to quantify, and multiple actions would have to be filed when the Allens' dogs come onto the Dickersons' property.

11

¶31. The trial court permanently enjoined the Allens "from allowing their dogs, or any dogs under their supervision, direction, or control, from coming onto the property owned or leased" by the Dickersons. The trial court further permanently enjoined the Allens "from aiding or assisting any third party in causing their dogs to come onto the property owned or leased" by the Dickersons.

¶32. The trial court next ruled that if any of the Allens "are found to be parked on the public road or public road right-of-way within sight of the property owned or leased by [the Dickersons] at any time when deer dogs are found to be running on [the Dickersons'] property, it shall be *prima facie* proof that the Allens parked on the public road or road right-of-way in violation" of the court's injunctions. The trial court stated that any violations of the injunctions would be punishable by the contempt powers of the court, which may subject the party found in contempt to a fine and a period of incarceration. The trial court reserved the right to assess all costs of court and reasonable attorneys' fees against any party found to be in contempt of court. Further, the Dickersons would be allowed to seek monetary damages if they could adequately quantify their loss to the court upon any of the Allens being found to be in contempt.

¶33. Lastly, because the Dickersons had not documented the exact number of times that they alleged that the Allens' dogs came onto their property and provided no proof regarding their allegations of spending thousands of dollars on seed and fertilizer for food plots, the trial court denied the Dickersons' request for monetary damages on the nuisance/loss of

12

peaceful and quiet enjoyment of property claim and denied the Dickersons' request for an award of attorneys' fees.

¶34. The Allens appealed the trial court's decision and raised the following issues verbatim:

1. Under ***Americrete Inc. v. W. Ala. Lime Co.*** and ***Biglane***, does a chancellor designate with adequate specificity a finding of private nuisance when the *Final Judgment* states multiple potential paths to a nuisance finding, but does not commit to any single legal analysis?

2. Under ***Biglane*** and other applicable authorities, does conduct amount of hunting with deer dogs to unreasonable [sic] under any nuisance analysis when: (1) the area has been utilized for deer hunting with dogs for decades, (2) Plaintiff himself hunted dogs in the same area, and (3) Defendants conduct typical and reasonable under all circumstances?

3. Under ***Biglane*** and other applicable authorities does the Plaintiff show a private nuisance with actual or appreciable damages when Plaintiff shows (1) the wildlife on the subject property may be disturbed, and (2) Defendants park on the public road adjacent the subject property?

4. Under ***Biglane*** and other applicable authorities, must a remedy for private nuisance address the alleged harm when the alleged harm stems from not only Defendants, but numerous third parties due to the locality and historical practices in the area, and the remedy does not account for these factors?

5. Under ***Punzo v. Jackson***, does a permanent injunction lie when there are alternative remedies?

6. Under ***Kelly v. Mississippi Valley Gas Co.*** does the judiciary impermissibly encroach on the legislature when it finds Miss. Code Ann. § 49-7-1.1 and Miss. Const. art. 3 § 12A inapposite to the current case?

**ANALYSIS**

13

¶35. "We 'always review a chancellor's findings of fact, but . . . will not disturb the factual findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard.'" ***Biglane v. Under the Hill Corp.***, 949 So. 2d 9, 13-14 (Miss. 2007) (alterations in original) (quoting ***Cummings v. Benderman***, 681 So. 2d 97, 100 (Miss. 1996)). This Court applies a de novo standard of review when determining questions of law. ***Id.*** (citing ***Cummings***, 681 So. 2d at 100).

**I.     Whether the trial court committed reversible error by failing to specify its path to finding private nuisance.**

¶36. The Allens first argue that reversal is warranted because the trial court's opinion lacks specific findings for nuisance. "A private nuisance is a nontrespassory invasion of another's interest in the use and enjoyment of his property." ***Biglane***, 949 So. 2d at 14 (internal quotation marks omitted) (quoting ***Leaf River Forest Prods., Inc. v. Ferguson***, 662 So. 2d 648, 662 (Miss. 1995), *abrogated on other grounds by **Adams v. U.S. Homecrafters***, 744 So. 2d 736 (Miss. 1999)). "One landowner may not use his land so as to unreasonably annoy, inconvenience, or harm others." ***Ferguson***, 662 So. 2d at 662 (internal quotation mark omitted) (quoting ***Bowen v. Flaherty***, 601 So. 2d 860, 862 (Miss. 1992)). A private nuisance may be found

> if, but only if, [the] conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> > (a) intentional and unreasonable, or

14

(b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

*Ferguson*, 662 So. 2d at 662 (quoting *Comet Delta, Inc. v. Pate Stevedore Co. of Pascagoula, Inc.*, 521 So. 2d 857, 859-60 (Miss. 1998)).

¶37.    The Allens contend that a private nuisance can only be "intentional and unreasonable" *or* "unintentional and otherwise actionable." *Id.* (quoting *Comet Delta, Inc.*, 521 So. 2d at 860). They argue that the trial court failed to proceed down a specific path to liability and that its failure constitutes an abuse of discretion. The Allens cite *Fulop v. Suta*, 847 So. 2d 893, 895 (Miss. Ct. App. 2002), in which the Court of Appeals held that "[f]ailure to provide this Court with findings of fact and conclusions of law precludes us from performing our appellate duties."

¶38.    We find no merit in this contention. The trial court issued a forty-six page opinion with detailed analysis. The opinion stated, in relevant part:

> This was clearly not a case of the Plaintiffs overreacting to a paltry one or two instances of the Defendants' dogs getting onto their land. Instead, the Defendants' dogs regularly and unreasonably entered onto the Plaintiffs' land.
>
> The intrusion of the Defendants' deer dogs onto the Plaintiffs' property can be characterized as intentional since the Defendants purposely unleashed the dogs on their own leased property, with full knowledge that the dogs will stray off their property while pursuing game, as much as fifty percent of the time, according to the testimony of Steve Allen, or some lesser percentage of the time, according to other Defendants.

Therefore, the trial court found that the private nuisance was both intentional and unreasonable.

¶39. The trial court further stated: "If the Defendants['] actions cannot be deemed intentional, they are at least reckless, because they continue to turn their deer dogs loose knowing full well that they may likely end up running deer on the Dickerson property multiple times each year." Instead of the trial court's failure to proceed down a specific path, the trial court held that the Allens were liable under either path to private nuisance. Therefore, the trial court held, with specific factual findings and law, that the repeated invasion of the Allens' dogs onto the Dickersons' property constituted a private nuisance.

## II. Whether deer hunting with dogs can be considered a private nuisance when done within the parameters of the law and in an area long known for dog hunting.

¶40. The Allens next contend that a finding of private nuisance requires unreasonable conduct. As this Court has stated, "[o]ne landowner may not use his land so as to *unreasonably* annoy, inconvenience, or harm others." ***Biglane***, 949 So. 2d at 14 (emphasis added) (internal quotation marks omitted) (quoting ***Ferguson***, 662 So. 2d at 662). The Allens argue that they reasonably used their leased property to hunt with dogs in an area traditionally associated with dog hunting. Therefore, the Allens state that reasonable conduct precludes a finding of private nuisance.

¶41. When determining whether an intrusion constitutes private nuisance, "[e]ach case must be decided upon its own peculiar facts, taking into consideration the location and the surrounding circumstances. It is not necessary that other property owners should be driven from their dwellings. It is enough that the enjoyment of life and property is rendered materially uncomfortable and annoying." ***Alfred Jacobshagen Co. v. Dockery***, 243 Miss.

16

511, 139 So. 2d 632, 634 (1962) (citing 39 Am. Jur. *Nuisances* § 59). This Court has

explained:

> [W]here the use of the property is not unreasonable, it will not, as a rule, be
> enjoined, nor can a person complaining thereof recover damages. The locality
> is to be considered in determining whether there is a nuisance—what might be
> a nuisance in one locality might not be such in another. . . . The law of private
> nuisance is a law of degree, and usually turns on a question of fact, whether
> the use is unreasonable or not, under all the circumstances. There is no hard
> and fast controlling rule; for the use under one set of facts might be reasonable,
> and unreasonable under another.

*Reed v. Cook Constr. Co.*, 336 So. 2d 724, 725 (Miss. 1976) (quoting *Reber v. Ill. Cent.*

*R.R. Co.*, 161 Miss. 885, 138 So. 574, 577 (1932)).

¶42.    Hunting is ingrained in this country's, and this state's, history. The Mississippi

Constitution provides that citizens

> have the right to hunt, fish and harvest wildlife, including by the use of
> traditional methods, subject only to laws and regulations that promote wildlife
> conservation and management and that preserve the future of hunting and
> fishing, as the Legislature may prescribe by general law. Public hunting and
> fishing shall be a preferred means of managing and controlling wildlife. This
> section may not be construed to modify any provision of law relating to
> trespass, property rights, the regulation of commercial activities or the
> maintenance of levees pursuant to Article 11.

Miss. Const. art. 3, § 12A. Further, Mississippi Code Section 49-7-1.1 states that

> Hunting, trapping and fishing are vital parts of the heritage of the State
> of Mississippi. It shall be the public policy of the State of Mississippi to
> protect and preserve these activities. The Mississippi Commission on Wildlife,
> Fisheries and Parks, acting by and through the [MDWFP], may regulate
> hunting, trapping and fishing activities in the State of Mississippi, consistent
> with its powers and duties under the law. No court of this state may enjoin,
> suspend, curtail or abrogate any hunting, trapping or fishing activity which is
> otherwise lawful under the laws of this state or the regulations of the

17

commission, except upon a showing, by clear and convincing evidence, of an immediate threat to the public health, safety and welfare, or other imminent peril. It is, and shall be, the public policy of this state to promote hunting, trapping and fishing and other outdoor recreational opportunities and to preserve these activities for all generations to come.

Miss. Code Ann. § 49-7-1.1 (Rev. 2012).

¶43.    Former Chief Justice Roy Noble Lee wrote:

Many men, including this writer, feel that a person who has never seen squirrels jump from limb to limb in the deep swamp on a frosty Fall morning; or has never heard a wild turkey gobble in April or seen him strut during mating season; or has never watched a deer bound through the woods and fields, or heard a pack of hounds run a fox, or tree a coon (raccoon); or has never hunted the rabbit, or flushed a covey of quail ahead of a pointed bird dog; or has never angled for bass or caught bream on a light line and rod, or taken catfish from a trotline and limb hook; has never lived.

*Strong v. Bostick*, 420 So. 2d 1356, 1364 (Miss. 1982).

¶44.    Yet "[j]ust as many hunters are impassioned with the beauty of the woods and wildlife and with the challenge of the hunt, so farmers and landowners also often feel strong bonds to their land." *James v. Mabus*, 574 So. 2d 596, 598 (Miss. 1990). "Property rights are necessary to preserve freedom, for property ownership empowers persons to shape and to plan their own destiny . . . ." *Murr v. Wisconsin*, 582 U.S. 383, 394, 137 S. Ct. 1933, 198 L. Ed. 2d 497 (2017). "The right to exclude is 'one of the most treasured' rights of property ownership." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 141 S. Ct. 2063, 210 L. Ed. 2d 369 (2021) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982)). "[T]he very idea of property entails 'that sole and despotic dominion which one man claims and exercises over the external things of the world,

in total exclusion of the right of any other individual in the universe." *Id.* (quoting 2 William

Blackstone, *Commentaries on the Laws of England* 2 (1766)).

¶45.    The Legislature has codified open season on deer with dogs under Mississippi Code

Section 49-7-31, which states

> (1)    The open season on deer shall be as follows:
>
> . . . .
>
> (b)    With guns and with dogs: from the Saturday prior to Thanksgiving through December 1.
>
> . . . .
>
> (f)    With guns and with dogs: December 24 through a date fixed by the commission that will provide a total of thirty-nine (39) days of hunting deer with guns and with dogs when added to the number of days provided for hunting deer with guns and with dogs in paragraph (b).

Miss. Code Ann. § 49-7-31(1)(b), (f) (Rev. 2012). The Allens argue that they reasonably

used their leased property to hunt with dogs in an area traditionally associated with dog

hunting. Yet the repeated intrusion of the Allens' deer dogs onto the Dickersons' land may

be considered unreasonable even if the Allens are hunting with dogs within the parameters

of the law.

¶46.    This Court previously has found that noise generated from a popular saloon that had

been in operation for more than twenty-five years was a private nuisance to neighbors who

had renovated and subsequently moved into an apartment next door. *Biglane*, 949 So. 2d at

12. The couple alleged that the live music coming from the saloon kept them up at night,

especially during the summer when the non-air-conditioned saloon would open its windows and doors to lessen the heat. *Id.* at 13. The chancellor found that the saloon was a private nuisance and enjoined it from leaving any doors or windows open while live music was being played and to stop customers from loitering in the streets. *Id.* This Court upheld the chancellor's ruling and stated that "[u]ltimately the trial court weighed the fact that the Biglanes knew or should have known that there was going to be some sort of noise associated with living 'within five feet of a well established saloon which provides live music on the weekends.'" *Id.* at 14. It wrote that "it is clear that the chancery court balanced the interests between the Biglanes and the Saloon in a quest for an equitable remedy that allowed the couple to enjoy their private apartment and while protecting a popular business and tourist attraction from over-regulation." *Id.* at 15.

¶47.    In *White v. Lewis*, the private nuisance alleged was "to have been committed by hogs, dogs, chickens and turkeys whose presence upon the property of complainants was not only annoying but created obnoxious incidents." *White v. Lewis*, 213 Miss. 686, 57 So. 2d 497, 498 (1952). There, this Court stated that "an injunction should not be granted except when a sub[s]tantial nuisance of a continuing character is found or its creation or continuance threatened." *Id.* This Court upheld the injunction against the landowner because testimony established she had owned hogs, dogs, and chickens. *Id.* It stated:

> We would not belittle the right of of [sic] a landowner to an undisturbed enjoyment of his land. There was sufficient testimony to justify the learned chancellor in his finding that the nature and extent of vexation by itinerant animals and fowls was sufficient to draw unto complainants the process of the

court.

*Id.* at 498-99.

¶48.    This Court also has upheld the chancellor's award of damages in favor of neighbors after a business erected a drive-in movie theater one fourth of a mile from their home. *Jenner v. Collins*, 211 Miss. 770, 52 So. 2d 638, 639 (1951). The neighbors testified that "from early evening until ten or eleven o'clock at night in the showing of the pictures, there were noises, talking, music, firing of guns, shooting, and screaming of women." *Id.* This Court affirmed the award of damages for nuisance and quoted a Pennsylvania Supreme Court case that stated: "No man has the right to take from another the enjoyment of the reasonable and essential comforts of life and, consequently, cannot commit acts on his own premises calculated to interfere with the reasonable enjoyment by others of their homes." *Id.* at 640 (quoting *Anderson v. Guerrein Sky-Way Amusement Co.*, 29 A.2d 682, 684 (Pa. 1943)).

¶49.    In *Williams v. King*, the Court of Appeals found, and we agree, that a neighbor's placement of an aggressive dog near the gate at the entrance of the complainants' residence constituted a private nuisance. *Williams v. King*, 860 So. 2d 847, 849 (Miss. Ct. App. 2003). Testimony established that the dog was threatening to others and frightened the complainants' child and visitors. *Id.* The Court of Appeals remanded the case to the chancellor for further consideration of an appropriate remedy. *Id.*

¶50.    In *Lambert v. Matthews*, the Lamberts "moved to their property a gamecock-breeding operation that consisted of approximately 100 birds . . . ." *Lambert v. Matthews*, 757 So. 2d

21

1066, 1068 (Miss. Ct. App. 2000). Neighbors of the Lamberts alleged that the noise generated from the operation caused a private nuisance. *Id.* Testimony established that the crowing of the roosters "was almost always a problem for the surrounding homeowners" and was supported by a videotape demonstrating the constant crowing. *Id.* at 1069. The Court of Appeals upheld the chancellor's decision to permanently enjoin the Lamberts from having more than two roosters on their property. *Id.* at 1070-71.

¶51.   Here, Investigator Walker testified that the Allens were well within their state law rights of sitting on the side of the road as long as they want to, even if the adjoining property belongs to the Dickersons. The Allens commit no crime by parking on the public road and collecting their dogs, as long as the Allens stay on the right-of-way. Officer Gholson testified that no law existed that would prohibit the Allens from running their dogs on the Dickersons' property. Further, there is no law that requires a deer hunt with dogs to have a specific amount of acreage on which to run the dogs, or to require a dog hunter to have certain collars, or to require dogs to be specially trained. Officer Gholson also testified that it is very common for dog hunters to use public roads to gather their dogs.

¶52.   The Allens further argue that locality is a factor in assessing the reasonableness of conduct. They point out that for dozens of years, the area has been used for hunting deer with dogs. Moreover, Steven testified that most of the land in the area is used for hunting and that, admittedly, they chose to build a house in a rural hunting area. Officer Gholson referred to the area as a "hot spot" for hunting with dogs. In 2019, additional game wardens were sent

22

after multiple calls from multiple landowners were received for dog running within the area. Further, even the land on which the Dickersons built their home had previously been used by the Burton Hunting Club to hunt deer with dogs. Therefore, according to the Allens, the Dickersons "act[] like a factory magnate who builds a home in an industrial sector, specifically to drive off rival factories through nuisance law."

¶53.    We agree with the Allens that locality is a factor in determining nuisance. But the fact that the area in question had long been used for dog hunting does not automatically make the Allens' conduct reasonable nor does it exclude the repeated intrusion of the Allens' hunting dogs from private nuisance. It was the chancellor's duty to balance the interests between the Allens and the Dickersons and to find an equitable remedy that would allow the Allens to continue hunting while also protecting the Dickersons' right to the quiet enjoyment of their property. The chancellor discussed the rights of private property ownership versus the right to hunt. He concluded that the right to hunt deer *with dogs* was a statutory right that did not override the long-standing rights of a landowner to the quiet enjoyment of his property. The chancellor found probative that article 3, section 12A, of the Mississippi Constitution states: "[t]his section may not be construed to modify any provision of law relating to trespass, property rights, the regulation of commercial activities or the maintenance of levees pursuant to Article 11." Miss. Const. art. 3, § 12A.

¶54.    The trial court heard testimony that the Dickersons knew or should have known that they were moving into an area that was traditionally used for deer hunting with dogs, as well

23

as testimony from both Cain and Steve that the area had changed in the past thirty years and that it had become more residential with many more houses in the area.

¶55.    Additionally, the conflict between the Allens and the Dickersons had been ongoing for as many as ten years. While Hunter testified that his dogs left Sand Hill property 5 to 10 percent of the time, Cain and Steve Allen testified that their hunting dogs left Sand Hill 50 percent of the time they were released. Officer Gholson testified that two or three times a season there would be encounters between the Allens or Cain and the Dickersons that required his presence. He also agreed that the Allens "should have the foreknowledge or knowledge before they turn these dogs loose that they're going to wind up on the Dickerson's [sic] property or that's a great possibility . . . ."

¶56.    This Court has acknowledged that clashes between hunters and landowners "are unavoidable." *James*, 574 So. 2d at 598. As this Court has stated, [a]t the outset, we must emphasize that our standard of review defers much to the chancellor's final judgment." *Sanderson v. Sanderson*, 824 So. 2d 623, 626 (Miss. 2002). Although the Allens were exercising their legal right to hunt deer with dogs on property that they leased, the repeated intrusion of the Allens' dogs onto the Dickersons' property during hunting season for many years can be considered unreasonable. Again:

> "In appeals from Chancery Court, our scope of review is limited. We will not reverse a Chancellor's findings of fact where they are supported by *substantial credible evidence* in the record." "[W]e, as an appellate court, will affirm the decree if the record shows any ground upon which the decision may be justified . . . . We will not arbitrarily substitute our judgment for that of the chancellor who is in the best position to evaluate all factors . . . ."

24

***Mabus v. Mabus***, 910 So. 2d 486, 488 (Miss. 2005) (alterations in original) (citations omitted).

¶57. The chancellor's decision in this case was adequately supported by substantial evidence.[5] Therefore, the chancellor did not abuse his discretion by finding that the Allens' conduct was unreasonable.

**III.    Whether reversal is warranted for failure to demonstrate damages.**

¶58. Next, the Allens argue that the Dickersons failed to show that the Allens' conduct resulted in damages. "When one makes such a use of his own land so as to unreasonably interfere with the rights of his neighbors in the exercise of their privileges or use of their lands, and when appreciable or actual damage is shown, he should be made to pay damages or cease such use." ***Blue v. Charles F. Hayes & Assocs., Inc.***, 215 So. 2d 426, 428 (Miss. 1968).

¶59. According to the Allens, the damages that the Dickersons pleaded are: 1) that the wildlife on the subject property are disturbed, and 2) that the Allens' parking on the road intimidates the Dickersons. The Allens contend that such damages are outside the realm of a nuisance claim. We disagree. The Dickersons alleged that the repeated invasion of the Allens' hunting dogs interfered with their ability to quietly enjoy their property, interfered

---

[5]The dissent warns against "so willingly deferring to the chancellor when a long-standing statutory right is in jeopardy." Diss. Op. ¶ 90. It is true that the Allens have a statutory right to hunt deer with dogs during the appropriate season. A hunting license does not, however, give the Allens the unfettered right to repeatedly allow their hunting dogs on private property.

25

with their chosen way to hunt, and interfered with the Dickersons' guests ability to enjoy their property.

¶60. Alyson testified that during dog hunting season, she sees one or all of the Allens or Cain almost every day. Steven testified that deer dogs had interrupted his still hunts many times. He stated that, most of the time when that happened, he would come out of the woods to the county road and see the Allens or Cain catching their dogs. Steven stated that he tried to prepare his land and improve his land for wildlife every day of the year, mainly by planting trees or food plots or by fixing the roads. According to Steven, when the deer dogs come through, it interferes with his ability to hunt his property as well as his guests' abilities to hunt the property.

¶61. Steven testified that the issues between the parties have been ongoing for years. Steven also averred that the confrontations between the parties have escalated over the years, as evidenced by the litigation between the parties. He stated that before he filed the current lawsuit, he had called the local game wardens numerous times as well as the Jackson MDWFP office. Steven had also driven to the Jackson MDWFP office, talked to his local representative, and contacted the local sheriff's department in an attempt to resolve the issues between the parties.

¶62. The trial court permanently enjoined the Allens "from allowing their dogs, or any dogs under their supervision, direction, or control, from coming onto the property owned or leased by" the Dickersons. Further, the trial court held that if any of the Allens "are found to be

26

parked on the public road or public road right-of-way within sight of the property owned or leased by the Plaintiffs at any time when deer dogs are found to be running on the Plaintiffs' property, it shall be *prima facie* proof that the Defendants parked on the public road or road right-of-way in violation of this Court's injunction imposed above." The trial court awarded no monetary damages. We find that the testimony established sufficient evidence of damages to support the trial court's issuance of injunctions.

**IV.     Whether the trial court's injunction adequately addresses the nuisance.**

¶63.    The Allens next argue that, in order to abate the purported nuisance, something more than an injunction would be required, such as a county-wide prohibition of all dog hunting. They argue that "[e]quity should adjust the remedy to the need in a nuisance case." ***Biglane***, 949 So. 2d at 15 (internal quotation marks omitted) (quoting ***Lambert***, 757 So. 2d at 1071).

¶64.    The Allens again point out that the community where the Dickersons reside is a "hot spot" for dog running and that other hunting clubs in the area also hunt deer with dogs. Testimony established, however, that the Dickersons did not have as much trouble with other hunting clubs. When Alyson was asked whether other hunting clubs were as big of a problem as the Allens or Cain, she responded: "Absolutely not." She agreed that dogs from other dog hunting clubs had been on her property occasionally but testified: "Not near as numerous—like there's no comparison." The Allens' attorney pointed out that in Alyson's deposition, she was asked how often run-ins occurred with individuals not involved in this case compared with the Allens or Cain, and she responded: "Probably about the same."

27

During the trial, however, Alyson testified that she had not understood the question that day. She stated that she had no problem with other hunting clubs. Steven corroborated Alyson's testimony and stated that he could "count on one hand" the number of times he had to stop and talk to hunters from other hunting clubs in the area. Steven testified that he had no problems with any of the other dog running clubs.

¶65. Investigator Walker testified that when the Dickersons would call to complain about hunting dogs on their property, it was usually because of someone in the Sand Hill Hunting Club, and it was usually Cain. Investigator Walker estimated that the Dickersons would call to complain approximately ten times a season. Officer Gholson testified that the Dickersons would complain about the Allens or Cain approximately two or three times a season. Further, the Sand Hill Hunting Club was the closest dog hunting club to the Dickersons' land.

¶66. Accordingly, the Allens' argument that the remedy fails to materially address the nuisance and succeeds only in enjoining particular dogs from being on the Dickersons' property lacks merit.

**V.     Whether alternative remedies preclude the issuance of a permanent injunction.**

¶67. The Allens next argue that adequate remedies at law exist that preclude the imposition of an injunction. "To obtain a permanent injunction, a party must show an imminent threat of irreparable harm for which there is no adequate remedy at law." ***Punzo v. Jackson Cnty.***, 861 So. 2d 340, 347 (Miss. 2003) (internal quotation marks omitted) (quoting ***Reynolds v. Amerada Hess Corp.***, 778 So. 2d 759, 765 (Miss. 2000)).

28

¶68. The Allens first argue that if they acted intentionally and the conduct interferes with the Dickersons' hunting, an adequate remedy at law exists in Mississippi Code Section 49-7-147. That Section provides:

> (1) No person shall intentionally:
>
> > (a) Interfere with or attempt to prevent the lawful taking of wildlife by another;
> >
> > (b) Attempt to disturb wildlife, or attempt to affect their behavior with the intent to prevent their lawful taking by another; or
> >
> > (c) Harass another person who is engaged in the lawful taking of wildlife or in the preparation for such taking.
>
> (2) Any person who violates subsection (1) is guilty of a Class II violation, punishable as provided in Section 49-7-143, Mississippi Code of 1972.

Miss. Code Ann. § 49-7-147 (Rev. 2012). But this argument is misleading. The Allens' participation in deer hunting with dogs does not correlate to intentionally interfering with the Dickersons' lawful taking of wildlife or intentionally harassing the Dickersons while they are engaged in hunting. No evidence has been presented that the Allens are even aware of when the Dickersons are or are not hunting. That the Allens' actions result in the interference of the Dickersons' still hunting does not correlate to specific intent to interfere.

¶69. Further, the Allens' contention that the Dickersons have an adequate remedy at law for stalking, assault, or various other personal torts or criminal statutes lacks merit. The basis of the Dickersons' complaint is not that the Allens are stalking or assaulting the Dickersons. The Dickersons allege that the repeated intrusions of the Allens' deer dogs onto their

property constitute a private nuisance. The trial court did not abuse its discretion by finding that the Dickersons presented sufficient evidence of private nuisance

## VI. Whether reversal is warranted to maintain separation of powers.

¶70.    Lastly, the Allens allege that the trial court's opinion and judgment go outside of the bounds of the judiciary and encroach upon the realm of the legislative branch. The Allens argue that former President James Madison's words in The Federalist are relevant here:

> It is agreed on all sides, that the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments. It is equally evident, that none of them ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers. It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it.

*Alexander v. State ex rel. Allain*, 441 So. 2d 1329, 1336 (Miss. 1983) (quoting The Federalist No. 48 (James Madison) (J. Cooke ed. 1961)), *overruled on other grounds by 5K Farms, Inc. v. Miss. Dep't of Revenue*, 94 So. 3d 221 (Miss. 2012).

¶71.    This Court's job is to "apply the law as it is written, not to rewrite it in view of public policy considerations which we think the Legislature failed to address. 'Our Constitution provides that if there is a public policy issue to be addressed, it is for the Legislature, not this Court.'" *Falco Lime, Inc. v. Mayor & Aldermen of City of Vicksburg*, 836 So. 2d 711, 725 (Miss. 2002) (quoting *Farmer v. B & G Food Enters., Inc.*, 818 So. 2d 1154, 1162 (Miss. 2002) (McRae, P.J., dissenting)).

¶72.    But the trial court's judgment does not encroach on the power of the legislature. The

trial court did not enjoin hunting as the Allens argue. Its issuance of injunctions under the specific facts of this case was well within its judicial authority. Therefore, this issue lacks merit.

## CONCLUSION

¶73. Because the trial court's finding of private nuisance was supported by the evidence and because its issuance of a permanent injunction was within its judicial authority and adequately addressed the nuisance, we affirm the judgment of the trial court.

¶74. **AFFIRMED.**

**COLEMAN, BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. MAXWELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, BEAM, CHAMBERLIN AND GRIFFIS, JJ. ISHEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, C.J., AND KITCHENS, P.J.**

**MAXWELL, JUSTICE, SPECIALLY CONCURRING:**

¶75. I agree the chancellor's ruling should be affirmed. But I write separately to emphasize that this is not a blanket ruling. Neither is it an indictment of lawful dog hunting nor a prohibition against it.

¶76. Instead, what this case boils down to is a chancellor's highly fact-specific determination in one lawsuit. And that suit was based on a litany of run-ins—over hunting dogs that admittedly left the Allens' property up to 50 percent of the time during their almost daily dog hunts—and the repeated, frequent, uninvited, and unwelcome intrusions of the Allens' dogs onto the Dickersons' property over the course of many continuous years and

31

hunting seasons.

¶77. The chancellor found these specific facts in this specific case amounted to a private nuisance disturbing the Dickersons' enjoyment of their land, requiring an injunction. Based on our well-established and highly deferential standard of review,[6] I see no error in this particular ruling.

**COLEMAN, BEAM, CHAMBERLIN AND GRIFFIS, JJ., JOIN THIS OPINION.**

**ISHEE, JUSTICE, DISSENTING:**

¶78. The majority contends that the chancellor did not abuse his discretion by (1) finding that the invasion by the Allens' dogs was unreasonable and (2) that the Allens' conduct was "at least reckless." Maj. Op. ¶¶ 39, 55. I respectfully disagree and find no private nuisance under these facts.

¶79. Beyond still hunting, various forms of hunting remain popular in Mississippi today, one of the oldest being hunting with dogs. Hunting with dogs has indeed been a statutory

---

[6] As this Court explained in ***Frazier v. Shackelford*** (***In re Estate of Carter***), 912 So. 2d 138, 143 (Miss. 2005):

> Our standard of review is indeed deferential, as we recognize that a chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is in the best position to judge their credibility. ***Culbreath v. Johnson***, 427 So. 2d 705, 708 (Miss. 1983). Moreover, since the chancellor is best able to determine the credibility of the witnesses' testimony, it is not this Court's province to undermine the chancellor's authority by replacing the chancellor's judgment with our own. ***Madden v. Rhodes***, 626 So. 2d 608, 616 (Miss. 1993) (*See* ***Mullins v. Ratcliff***, 515 So. 2d 1183, 1189 (Miss. 1987); ***Hall v. State ex rel. Waller***, 247 Miss. 896, 903, 157 So. 2d 781, 784 (1963)).

right in our state for decades, and although contentious, is still widely practiced. Under Mississippi Code Section 49-7-31(1)(b) and (f), the practice is confined to a specific time period—"from the Saturday prior to Thanksgiving through December 1" and from "December 24 through a fixed date . . . that will provide a total of thirty-nine (39) days . . . ." Miss. Code Ann. § 49-7-31(1)(b), (f) (Rev. 2012). Considering this constraint, the Allens can be viewed as nothing other than lawful hunters. They are members of the Sand Hill Hunting Club who, in the appropriate time period, hunt with dogs on a property that has been leased to do so for forty years.

¶80. The present case has arisen, of course, because the Allens' hunting dogs occasionally stray from the property on which they are released to chase deer. As this Court has previously noted, however, "[a] private nuisance is a nontrespassory invasion of another's interest in the use and enjoyment of his property. One landowner may not use his land so as to unreasonably annoy, inconvenience, or harm others . . . ." *Christmas v. Exxon Mobil Corp.*, 138 So. 3d 123, 126 (Miss. 2014) (alteration in original) (quoting *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 662 (Miss. 1995), *overruled on other grounds by Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736 (Miss. 1999)). The nuisance analysis here is thus limited to the effects the Allens' hunting dogs have on the Dickersons and should not consider any trespassory implications the dogs' being on the Dickerson property may have.

¶81. The Dickersons allege six annoyances: (1) that they physically caught the Allens' or

Cain's dogs on their property "two to four times a year" Maj. Op. ¶ 28; (2) that they encounter the Allens' or Cain's dogs on their property "often" Maj. Op. ¶ 27; (3) that the presence of the dogs interferes with their still hunting; (4) that they hear gunshots from their house; (5) that the gunshots make them fear for their children's safety; and (6) that the Allens and Cain use a public road near their house in order to collect their hunting dogs.

¶82.    The last three annoyances lack merit since (1) the Allens may shoot guns in proximity to residences so long as they are hunting legally, and (2) the Allens are no doubt within their rights being on a public road.  I therefore proceed with a focus on the first three annoyances. For the Allens' conduct to amount to a private nuisance, it must be "an invasion of" the Dickersons' "interest in the private use and enjoyment of [their] land" and "that invasion" must be "either (a) intentional and unreasonable, or (b) unintentional but otherwise provide[] the basis for a cause of action for negligent or reckless conduct or abnormally dangerous conditions or activities." *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 14 (Miss. 2007) (citing *Ferguson*, 662 So. 2d at 662).

¶83.    As to (a), I concede that the Allens *intentionally* release their hunting dogs knowing that they could end up on neighboring properties.  I take issue with saying that the dogs' occasionally entering the Dickerson property is *unreasonable*, however.  To reiterate, under Mississippi Code Section 49-7-31(1)(b) and (f), the Allens have a statutory right to hunt deer with dogs.  And as the record confirms, hunting dogs are unpredictable.  Deer run where their wild instincts lead them, and hunting dogs give chase.  Hunting dogs are thus difficult to

34

control by their very nature. Once they are in pursuit, the methods of controlling them—wrangling them with hunters, diverting them with vehicles, and stopping them with shock collars—do not always prove effective. Further, shock collars risk ruining a hunting dog's ability to track deer by putting the dog in perpetual fear of physical punishment.

¶84. I note this unpredictability to emphasize that to hunt with dogs is to hunt with the potential of the dogs' wandering onto neighboring properties. Despite this inherent potential, the Allens have taken extraordinary measures to control their hunting dogs, including the use of GPS tracking and corrective collars. They also use vehicles on a public road to corral and locate their dogs. None of these measures are required by statute and thus clearly evince an affirmative, voluntary effort on the Allens' part to limit the negative effects their hunting dogs might have on nearby property owners.[7]

¶85. Returning to the effects of the dogs on the Dickersons, I struggle to find anything unreasonable. As the majority notes, Steven Dickerson "stated . . . that he . . . physically [caught] the Allens' or Cain's dogs on his property two to four times a year." Maj. Op. ¶ 28. His only other meritable claims are (1) that he encounters the Allens' or Cain's dogs "often[,]" Maj. Op. ¶ 27, and (2) that the dogs interrupt his still hunts. Both of these claims are largely unsubstantiated in the record and rely on inexact assumptions, however. Besides Dickerson's ambiguous claim about the frequency of the dogs' invasion, only Officer

---

[7] As the chancellor clarified in his final judgment, "[t]here are no Mississippi statutes that require hunting dogs to be equipped with GPS collars or correction collars that would allow the dogs to be stopped before they cross onto the property of private landowners."

35

Gholson's testimony informs how often the dogs were on the Dickerson property. And this testimony points to a minimal number of occasions. He in fact "testified that approximately two to three times a season there would be encounters that required his presence between the Dickersons and the Allens or Cain." Maj. Op. ¶ 12. As to the claim that still hunts were being interrupted, the only way to validate the Dickersons' claim is to *assume* that the dogs were close enough or loud enough to scare away the deer that Dickerson may or may not have taken in the course of any given hunt. The only measured potential nuisance is therefore the dogs' being confirmed on the Dickerson property on, at most, four occasions per year. This infrequent invasion is hardly unreasonable and does not render the Dickersons' "enjoyment of life and property . . . materially uncomfortable and annoying." *Biglane*, 949 So. 2d at 15 (internal quotation mark omitted) (quoting *Alfred Jacobshagen Co. v. Dockery*, 243 Miss. 511, 517, 139 So. 2d 632, 634 (1962)).

¶86. I would note that, under Mississippi Code Section 49-7-31, the Dickersons are afforded a number of weeks to still hunt their property when hunting with dogs is prohibited. They can hunt "[w]ith bow and arrow" from "October 1 through the Friday prior to Thanksgiving." Miss. Code Ann. § 49-7-31(1)(a) (Rev. 2012). They can hunt "[w]ith primitive weapons and without dogs" from "December 2 through December 15." Miss. Code Ann. § 49-7-31(1)(c) (Rev. 2012). And they can hunt "[w]ith guns and without dogs" from "December 16 through December 23." Miss. Code Ann. § 49-7-31(1)(d) (Rev. 2012).

¶87. The majority admits that this Court has held that

36

[t]he locality is to be considered in determining whether there is a nuisance—what might be a nuisance in one locality might not be such in another . . . . The law of private nuisance is a law of degree, and usually turns on a question of fact, whether the use is unreasonable or not, under all the circumstances.

*Reed v. Cook Const. Co.*, 336 So. 2d 724, 725 (Miss. 1976) (quoting *Reber v. Ill. Cent. R.R. Co.*, 161 Miss. 885, 138 So. 574, 577 (1932)).

¶88.     Given that it is undisputed that the subject area is a known hunting dog area and that it has been for decades, it is lost on me (1) how at most four confirmed instances of wandering hunting dogs per year amount to a private nuisance and (2) how the Dickersons, who bought property in the area with knowledge of the frequent hunting there, can succeed on a private nuisance claim to the detriment of the Allens' right to hunt with dogs.

¶89.     In *Biglane*, this Court noted that "the trial court weighed the fact that the Biglanes knew or should have known that there was going to be some sort of noise associated with living 'within five feet of a well established saloon which provides live music on the weekends.'" 949 So. 2d at 14.  This consideration admittedly did not shield the saloon from the Biglanes' private nuisance claim in that case, but I would point out that, there, the saloon was in operation year round and played loud music multiple days a week. *Id.* at 13-14.  Here, however, the Allens' hunting dogs wander onto the Dickerson property occasionally during a limited period.  Any sound balancing test on the chancellor's part should have therefore revealed that the invasion by the Allens' dogs fell well within the amount of minor contact with hunting dogs the Dickersons were to reasonably expect when moving into the area.

¶90.    While the majority holds that "[t]he chancellor's decision [that the Allens' conduct was unreasonable] . . . was adequately supported by substantial evidence[,]" I find it necessary to warn against so willingly deferring to the chancellor when a long-standing statutory right is in jeopardy.  Maj. Op. ¶ 57.  The "substantial evidence" the majority references appears to be at most only four *confirmed* instances of the dogs being on the Dickerson property.  Maj. Op. ¶ 57.  Beyond this evidence, the record provides considerable testimony that shows (1) that the Allens have never been cited for unlawful hunting; (2) that the Allens, by being on the public road, were doing no more than trying to collect their dogs; (3) that the Dickersons have proved little more than a few annual instances of the Allens' dogs being on their property; (4) that the Dickersons did not actually prove any specific hunt was interrupted by the Allens' dogs; and (5) that the Dickersons did not prove any property damage caused by the Allens' dogs.  In sum, the Dickersons are disgruntled merely by a byproduct of a statutory right—hunting dogs wandering while in the course of a legal hunt.  The invasion by the Allens' dogs therefore is not unreasonable here.

¶91.    Turning to option (b) under a private nuisance analysis, the chancellor found that "[i]f the Defendants['] actions cannot be deemed intentional, they are at least reckless, because they continue to turn their deer dogs loose knowing full well that they may likely end up running deer on the Dickerson property multiple times each year."  Maj. Op. ¶ 39 (alteration in original) (internal quotation marks omitted).  This finding is more inexplicable than the unreasonable finding.  If the Allens are reckless in their use of hunting dogs, then all hunters

38

who hunt with dogs must also be reckless. As I made clear above, to hunt with dogs is to hunt with the potential that those dogs may wander onto neighboring properties. The chancellor seems to reason that legally hunting with dogs is reckless on its face. This logic is fundamentally and statutorily flawed, and I would accordingly hold that the chancellor was manifestly wrong in finding that the Allens' hunting dogs occasionally ending up on the Dickersons' property amounts to a private nuisance.

¶92. I further write to express my concern over the absence of equity in the injunction exacted upon the Allens. The injunction enjoined the Allens from (1) "[']allowing their dogs, or any dogs under their supervision, direction, or control, from coming onto the property owned or leased' by the Dickersons" and (2) "[']aiding or assisting any third party in causing their dogs to come onto the property owned or leased' by the Dickersons." Maj. Op. ¶ 31. These terms are undeniably draconian and result in the total deprivation of the Allens' statutory right to hunt with dogs.

¶93. This Court and the Court of Appeals have analyzed private nuisance claims in several prior cases, most importantly *Biglane*. These cases share an important common thread—they each evince at least a cursory attempt on the chancellor's part to preserve the interests of the party accused of causing the alleged nuisance. For example, in *Biglane*, the chancellor mandated that the local "Saloon could not 'operat[e] its business with its doors and windows opened during any time that amplified music is being played inside the saloon.'" 949 So. 2d at 15 (alteration in original). The chancellor did not, however, enjoin the saloon from

39

playing music entirely. *Id.* at 13. In **Dockery**, the chancellor mandated that a factory had to take all available action to eliminate the odors affecting nearby residents. 139 So. 2d at 633. The chancellor did not, however, enjoin the factory from operating entirely. *Id.* In **Lambert v. Matthews**, 757 So. 2d 1066, 1068 (Miss. Ct. App. 2000), the chancellor "enjoined the Lamberts from keeping more than two roosters on their property at any time." The chancellor did not, however, enjoin the Lamberts from keeping roosters entirely. *Id.* This Court and the Court of Appeals affirmed the above judgments respectively, which all limited the alleged nuisance without totally depriving the accused party of their ability to operate.

¶94.    In contrast, the chancellor here allowed a private nuisance claim to strip the Allens of their statutory right to hunt with dogs. The Allens simply cannot hunt with dogs if their dogs can, under no circumstances, wander onto the Dickerson property. Again, *hunting with dogs involves the potential that the dogs will occasionally end up on neighboring properties*. This truth is indeed difficult to accept for many in Mississippi and has led to conflict in the past. As the chancellor noted, "deer hunting with dogs is a volatile political issue in the State of Mississippi[,]" and multiple failed Senate bills have attempted to impose collar requirements and even ban hunting with dogs altogether. But while some people may be unhappy with the practice and its effects, *hunting with dogs remains legal*. And I hesitate to affirm a decision that effectively bans the Allens from engaging in it simply because their dogs wander onto a neighboring property a minimal number of times during a brief hunting season.

¶95. Short of lobbying the Sand Hill Hunting Club to fence in the entire nine hundred acre property it hunts, the Allens have taken most, if not all, available action to control their dogs. Considering the law, their dogs' invasion of the Dickerson property has been reasonable. And they certainly have not been reckless. I therefore respectfully dissent.

**RANDOLPH, C.J., AND KITCHENS, P.J., JOIN THIS OPINION.**