# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-01751-SCT

*JAMES M. BIGLANE AND NANCY K. BIGLANE*

*v.*

*UNDER THE HILL CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/22/2005 |
| TRIAL JUDGE: | HON. GEORGE WARD |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN G. CORLEW |
| | VIRGINIA T. MUNFORD |
| | BRUCE M. KUEHNLE, JR. |
| | PHILIP ELMER CARBY |
| ATTORNEY FOR APPELLEE: | T. MACK BRABHAM |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND RENDERED. ON CROSS-APPEAL: AFFIRMED - 02/08/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., DIAZ AND DICKINSON, JJ.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1.     In this case we are asked two questions.  First, was the noise coming from a local saloon such that it constituted a private nuisance to the residents of an apartment next door?  Second, were the actions of the neighbor of the saloon a tortious interference with business relations?  After a review of the case, we conclude there was a nuisance, but no tortious interference with business relations.

**FACTS**

¶2.   "No spot on the American continent ever bore a viler name" wrote one historian about the section of Natchez that was closest to the mighty Mississippi River.  Edith Wyatt Moore, *Natchez Under-The-Hill* 7 (1958).  The spot gained its name from the bluffs of loess which the river carved through easily, creating an "upper" Natchez and the one called "under-the-Hill."  "Early travelers described it variously as a gambler's paradise, a sink-hole of iniquity and a resort of the damned," likely because "legitimate business houses and firms lined the streets but . . . were far outnumbered by gambling dens, saloons, houses of ill repute," not to mention the presence of pirates and slave-traders—or the possibility that the rule of code duello might be invoked at any time.  *Id.* at 7-9.

¶3.   "For the size of it, there is not, perhaps in the world, a more profligate place," said one visitor, while another called it "hell on earth, with bells attached." David G. Sansing, *Natchez:  An Illustrated History* 65 (1992).  At one point "[s]treet brawling in Natchez became so prevalent that [Spanish Mayor Manuel] Gayoso issued a ban on knives and other metal weapons," to little effect.  *Id.* at 46.

¶4.   Straddling the uncertain area between crumbling cliffs and the wild river, Natchez Under-the-Hill suffered many natural disasters, and "[s]ome claim that the Great River, in revenge against the place that shamed its name, altered its course, widened its banks and gobbled up much of that awful place."  *Id.* at 66.  Indeed, the "fine mansions and patrician elegance" of the upper city "soon eclipsed the fame of Natchez's lower half, though both found an easy journey into lore and legend."  *Id.* at 48.

¶5.   Time and great changes in technology eliminated the necessity of Natchez as a port, as the riverboats gave way to steam-powered locomotives, which in turn gave way under the

advent of automobiles and airplanes. "It was the area's infamous past, however, that eventually saved it and secured its future," as the growing tourist industry brought those persons who "could not resist the pull of the landing's past, the power of its legends or the magic of its name: Natchez Under-the-Hill." *Id.* at 164. Tourists began to flock to Silver Street—the only remaining portion of Under-the-Hill—in much the same way they began pilgrimages to sprawling and majestic homes such as Rosalie, the stately mansion used as a headquarters for the Union forces in the Civil War; Longwood, the legendarily-unfinished octagon house; and the Burn, used as a hospital during the War, with its towering spiral staircase.

¶6.	Onto this stage strode the two families who take center stage in the case at hand. In 1967 Nancy and James Biglane purchased a dilapidated building at 27 Silver Street that had been built in the 1840s, and opened the lower portion of the building as a gift shop in 1978. In 1973, Andre Farish, Sr., and Paul O'Malley purchased the building directly next door, at 25 Silver Street, which had been built in the 1830s; in 1975 they opened the Natchez Under the Hill Saloon. Eventually the Saloon would come to be run by the children of Mr. Farish, Melissa and Andre, Jr.

¶7.	The Saloon would establish itself proudly as a welcoming haven for locals and visitors alike, and maintained its presence on 25 Silver Street as other businesses came and went. The Biglanes began converting the upper floors of 27 Silver Street into a large apartment, which they moved into in 2002.

¶8.	Despite installing insulated walls and windows, locating their bedroom on the side of the building away from the Saloon, and placing their air conditioner unit on the side nearest

3

the Saloon, the Biglanes quickly realized they had a problem: the raucous nature of the Saloon kept them wide awake at night.

¶9. Specifically, it was live music, a hallmark of the Saloon. During the summertime the un-air conditioned Under the Hill opened its windows and doors to lessen the heat inside, and music echoed up and down Silver Street. While the music was easier on Mr. Biglane, who had lost his hearing over the years, it was particularly difficult on Mrs. Biglane, who was frustrated by the constant rock and roll, conversation, and the clack of pool balls.

¶10. The Biglanes contacted the Saloon and asked that the music be turned down, and it was: Mr. Farish got rid of Groove Line, the band that seemed to trouble the Biglanes the most, and installed thick windows to block noise. He also purchased a sound meter by which bands could measure their output in decibels, and forbade them from going over a certain point.

¶11. Still dissatisfied, the Biglanes blocked off two nearby parking lots that served the Saloon, using a cable over the entrance of one and crafting a metal gate over another. Ultimately this classic neighborly dispute spilled into the Chancery Court of Adams County, prompted by a complaint from the Biglanes.

¶12. The couple alleged private nuisance, among other causes of action, and Under the Hill counterclaimed, alleging that the Biglanes had tortiously interfered in its business (by blocking the nearby parking lots) and defamed them (by sending a letter of complaint to the City Attorney).

¶13. The trial court heard multiple witnesses who testified to a dazzling array of subjects, including a historian who described the origins and evolution of under-the-Hill and a doctor

4

with an expertise in sound who played loud music in court to replicate the alleged decibel levels of Under the Hill. The trial court ultimately rendered a highly detailed and intricately reasoned opinion and order than ran to 17 pages.

¶14. The chancellor determined that Under the Hill was a private nuisance to the Biglanes, and enjoined the Saloon from leaving open any doors or windows when music was playing, and ordered it to prevent patrons from loitering in the streets. The trial court also found that the Biglanes had tortiously interfered with the business relations of Under the Hill. Although no damages were actually shown, the trial court assessed nominal and punitive damages because of the intentional character of the conduct.

¶15. In lieu of setting an amount for damages, the trial court attempted to bring the parties together for "the opportunity to reach some type of an agreement which will allow the Under the Hill Saloon employees and patrons to park in the Water Street area." This attempt to reconcile the parties failed, and the Biglanes quickly filed a motion that the trial court reconsider its ruling regarding punitive damages. It did so, voiding the award of punitive damages and setting nominal damages at $500.

¶16. Aggrieved, the Biglanes appealed, arguing that damages were improperly awarded, and Under the Hill cross-appealed, arguing that its business was not a private nuisance.

**STANDARD OF REVIEW**

¶17. In this case we are presented with questions of law and fact arising from the determination of a chancery court. We "always review a chancellor's findings of fact, but . . . will not disturb the factual findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his

5

discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard."

*Cummings v. Benderman*, 681 So. 2d 97, 100 (Miss. 1996). We use a de novo standard when analyzing questions of law. *Id.*

## DISCUSSION

### I. Is the Under the Hill Saloon a Private Nuisance to the Biglanes?

¶18. The Biglanes asserted that the Saloon was a private nuisance. "A private nuisance is a nontrespassory invasion of another's interest in the use and enjoyment of his property." *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 662 (Miss. 1995). "One landowner may not use his land so as to unreasonably annoy, inconvenience, or harm others." *Id.* (internal quotations and citation omitted).

¶19. An entity is subject to liability for a private nuisance only when its conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land and that invasion is either (a) intentional and unreasonable, or (b) unintentional but otherwise provides the basis for a cause of action for negligent or reckless conduct or for abnormally dangerous conditions or activities. *Id.*

¶20. The trial court proceeded under the first path of liability—whether the conduct complained of was intentional and unreasonable. After reviewing the evidence presented at trial, the chancellor found ample evidence that the Biglanes frequently could not use or enjoy their property—significantly, that Mrs. Biglane often slept away from the apartment on weekends to avoid the noise and that she could not have her grandchildren over on the weekends because of the noise. The audiologist who testified for the Biglanes concluded that the noise levels were excessive and unreasonable, although he also conceded that he had

6

never measured the noise levels in the couple's bedroom. This problem was exacerbated during the summer months, when the un-airconditioned Saloon left its doors and windows open to defray the oppressive Natchez heat.

¶21. The Saloon did offer a witness who lived in back of the establishment who said he never had any problems with the noise, but the chancellor held that he was not an impartial witness, since he was testifying for his landlord.

¶22. Ultimately the trial court weighed the fact that the Biglanes knew or should have known that there was going to be some sort of noise associated with living "within five feet of a well established saloon which provides live music on the weekends."

¶23. We have examined similar issues before. An important Mississippi case regarding private nuisance based on the actions of a neighbor is *Alfred Jacobshagen Co. v. Dockery*, 243 Miss. 511, 139 So. 2d 632 (1962). In that case a group of residents in Byram were overwhelmed by the "repulsive" odors of a nearby rendering plant. *Id.* at 514-15, 139 So. 2d at 632-33.

¶24. The general rule is that "[a] business, although in itself lawful, which impregnates the atmosphere with disagreeable and offensive odors and stenches, may become a nuisance to those occupying property in the vicinity, where such obnoxious smells result in a material injury to such owners." *Id.* at 517, 139 So. 2d at 634. This same rule extends to a situation where a lawful business injects loud music into the surrounding neighborhoods. For "[a] reasonable use of one's property cannot be construed to include those uses which produce obnoxious [noises], which in turn result in a material injury to owners of property in the vicinity, causing them to suffer substantial annoyance, inconvenience, and discomfort." *Id.*

7

¶25. Accordingly, even a lawful business—which the Under the Hill Saloon certainly is[1]—"may become . . . a nuisance" by interfering with its neighbors' enjoyment of their property." *Id.* We recognize that "[e]ach [private nuisance] case must be decided upon its own peculiar facts, taking into consideration the location and the surrounding circumstances." *Id.* Ultimately, "[i]t is not necessary that other property owners should be driven from their dwellings," because "[i]t is enough that the enjoyment of life and property is rendered materially uncomfortable and annoying." *Id.*

¶26. In *Dockery* we deferred greatly to the chancery court and determined that it "had the power to enjoin such future operations of the rendering plant as constituted in fact a nuisance," and that it also "had the lesser power to permit continued operation of the plant, subject to certain stated conditions and requirements." 243 Miss. at 517, 139 So. 2d at 634; *see also* **Lambert v. Matthews**, 757 So. 2d 1066, 1068 (Miss. Ct. App. 2000) (chancery court's limitation on farmowners "from keeping more than two roosters on their property at any time" was affirmed as a proper equitable response to private nuisance caused by the crowing of the birds).

¶27. In the case at hand, the trial court exercised its power to permit continued operation

---

[1] In 1963 the City of Natchez zoned the area encompassing Silver Street as a "WD district," or a waterfront development district; the ordinance is still in place today. It explicitly authorized "as of right" the use of dwelling homes such as the Biglanes' and businesses like Under the Hill. The ordinance noted that "[i]It is intended that [the WD district] be reserved for active uses which animate the waterfront and take advantage of their proximity to the waterfront. Such uses should be oriented toward the enjoyment of tourists and citizens of the community. Primary objectives include visual and limited physical access to the water, a pedestrian-friendly environment, limited automobile access and parking, and the preservation and enhancement of the distinct character of the historic waterfront."

of the Saloon while setting conditions to its future operation. Namely, it found that the Saloon could not "operat[e] its business with its doors and windows opened during any time that amplified music is being played inside the saloon." The chancery court found "that such a limitation is reasonable in that it should help contain the noise within the saloon, and should discourage the bar patrons from congregating or loitering in the streets outside of the saloon."

¶28. From a review of the record it is clear that the chancery court balanced the interests between the Biglanes and the Saloon in a quest for an equitable remedy that allowed the couple to enjoy their private apartment and while protecting a popular business and tourist attraction from over-regulation. *See also **Lambert***, 757 So. 2d at 1071 ("Equity should adjust the remedy to the need in a nuisance case"). Accordingly, we agree that the Saloon was a private nuisance to the Biglanes and affirm the trial court's equitable conditions placed upon its continued operation.

## II. Was There a Tortious Interference with Business Relations?

¶29. In response to the Biglanes' assertion that the Saloon was a private nuisance, the bar counterclaimed, arguing that its neighbors had interfered with the operation of their business. "There are four elements necessary to prove a claim of tortious interference with a business relationship: (1) The acts were intentional and willful; (2) The acts were calculated to cause damage to the plaintiffs in their lawful business; (3) The acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); (4) Actual damage and loss resulted." ***MBF Corp. v. Century Business Comms., Inc.***, 663 So. 2d 595, 598 (Miss. 1995). In this case the Biglanes essentially concede the presence of the first two prongs, but urge that neither the third nor

the fourth factors were satisfied. If any of the factors are not met, there cannot be a finding of tortious interference with business.

### A. "Without Right or Justifiable Cause."

¶30.    Mr. Biglane, or corporations of which he has substantial control, owns much of the property surrounding the Under the Hill Saloon, including multiple parking areas around the Saloon. After the tensions escalated between the Biglanes and the Saloon, Mr. Biglane caused the two parking areas in his control to be blocked, one with a cable gate after 6:00 p.m. and the other by an iron gate. It is undisputed that Mr. Biglane controls the former lot outright, but the ownership of the second lot—the so-called Water Street area—is more complicated.

¶31.    Ownership of the property is important because it speaks to the third factor of the tort—that the allegedly tortious acts must be performed without right or justifiable cause. It is a basic tenet of property law that a landowner or tenant may use the premises they control in whatever fashion they desire, so long as the law is obeyed. *See generally **Ewing v. Adams***, 573 So. 2d 1364, 1367-68 (Miss. 1990). This leads to the logical conclusion that a landowner or valid tenant may forbid any other persons from using their property. This ideal is protected in our law to the point that there are both civil and criminal prohibitions against trespassing. *See **Alexander v. Brown***, 793 So. 2d 601, 605 (Miss. 2001) (definition of civil trespass); Miss. Code Ann. § 97-17-87 (Rev. 2006) (criminal trespass).

¶32.    Generally speaking, it cannot be malicious for a person to refuse access to others to their private property. Accordingly, blocking off the parking lot he owned in whole was not tortious conduct by Mr. Biglane.

10

¶33.   The property comprising the area called Water Street is a different matter. There was extensive testimony by multiple witnesses regarding the property, its history, nature, and various owners–whether Mr. Biglane, the City of Natchez, or others. The Water Street property is not a paved street per se, but an area that has been built up on the western bank of the Mississippi River by placement of rock and soil.

¶34.   Part of Water Street is a parking lot, and the city engineer testified that roughly two parking spaces, or portions of the spaces, were owned by the city. Another portion of Water Street is a boat ramp owned by Mr. Biglane. The city has a permanent easement to use the ramp, but of late it is basically only used by riverboat traffic. Previously the only access to the city's portions of Water Street were through Mr. Biglane's parcel, and the city engineer testified that blocking the city's right of way was impermissible, as the city no longer had use and access to the property they owned or had access to its easement because of the gate. There was also testimony that there had been a city-owned sign advertising the area as parking for the public that was later taken down. The city ultimately acquiesced to the placement of the gate and the blocking of its own property.

¶35.   It is undisputed that Mr. Biglane erected an iron gate blocking Water Street. The chancellor found that part of the property blocked by the iron gate was owned by the city; that the gate itself partially rested upon city property; and that two of the parking spaces blocked by Mr. Biglane were city property. In light of this evidence, the trial court found that the third factor required for tortious interference with business was present—that Mr. Biglane did not have the right to block property which he did not own from public access.

¶36.   Substantial evidence provided at trial and in the record supported the detailed and

11

extensive findings of fact provided by the trial court. Accordingly, we defer to the chancellor's findings and conclude that the Biglanes acted without right in blocking the Water Street property. Yet our inquiry does not end there.

### B. "Actual Damage and Loss Resulted."

¶37. Next we must consider whether the Under the Hill Saloon was damaged by the actions of the Biglanes. To satisfy this tort, we require "actual" damages, which are synonymous with "compensatory" damages; they are substantial, rather than nominal. *ACI Chems., Inc. v. Metaplex, Inc.*, 615 So. 2d 1192, 1202 (Miss. 1993).

¶38. This does not mean that an exact dollar value must be set before we can find actual damages. In the case of *ACI Chemicals*, we affirmed a chancellor's finding of tortious interference with business relations when a company, after suffering interference from a competitor, no longer received any new orders from a customer; when its credit line was frozen; and it lost the opportunity to solicit business from at least three potential customers. *Id.* at 1202. We found that this was evidence of actual damages. *Id.* This is in accord with the public policy underscoring this tort: to maintain a fair and legal playing field between competitors in the business arena.

¶39. In the case at hand, Under the Hill conceded that it could not demonstrate a loss of income from the lack of parking. In fact, business had slightly increased after the parking lots were blocked by Mr. Biglane, which was attributed by Mr. Farish to more riverboats docking in Natchez. There was evidence that one server at the Saloon had worked less than she had in years, but no receipts or other evidence was presented by the Saloon to demonstrate any sort of a loss. In its amended order the trial court found that punitive

12

damages were not warranted under these facts, and accordingly declined to assess attorney's fees against the Biglanes. *Compare ACI Chems.*, 615 So. 2d at 1194 (attorney's fees can be warranted when trial court assesses punitive damages in tortious interference with business case).

¶40.    The trial court assessed a damages award of $500 for "nominal damages" because it determined the Biglanes' conduct was intentional. The trial court based this finding upon the basic legal concept that nominal damages can be awarded for intentional torts. *See Williams v. Wiggins*, 285 So. 2d 163, 164-65 (Miss. 1973) ("nominal damages . . . can only be granted in the absence of actual injury in cases of intentional tort," and not in cases involving negligence). The situation at hand is different. Unlike intentional torts such as trespass or battery, "actual damage and loss" is a required component of the tort of interference with business relations. As noted *supra*, this factor can be met in differing ways, but it must be met. The Under the Hill Saloon admitted it had suffered no actual damage or loss. Nominal damages do not satisfy a finding of the tort of intentional interference with business relations. In this type of case, there must be actual damages. Because the fourth factor was not met, there cannot be a tortious interference with business and the award of nominal damages must be reversed.

## CONCLUSION

¶41.    This is a classic case of a dispute between two neighbors. We reaffirm our position that a finding of tortious interference with business relations must be based upon a finding of actual damages, and also that a landowner may not use its property in such a fashion as to unreasonably deprive another of the use or enjoyment of their property. We therefore

13

affirm the chancery court's judgment finding a private nuisance but reverse the award of

$500 in damages against the Biglanes for tortious interference with business relations.

¶42.    **ON DIRECT APPEAL: REVERSED AND RENDERED. ON CROSS-APPEAL: AFFIRMED.**

    **SMITH, C.J., WALLER AND COBB, PJJ., EASLEY, CARLSON AND GRAVES, JJ., CONCUR. DICKINSON, J., CONCURS IN RESULT ONLY. RANDOLPH, J., NOT PARTICIPATING.**