# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00665-COA

**1ST STEP SOBER LIVING LLC AND SCOTT SMITH**                    APPELLANTS

**v.**

**BILL CLEVELAND, ET AL., AND CITY OF TUPELO, MISSISSIPPI**                    APPELLEES

DATE OF JUDGMENT:               05/02/2023
TRIAL JUDGE:                    HON. BRADLEY D. TENNISON
COURT FROM WHICH APPEALED:      LEE COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANTS:       MARK WHITBURN
                                LAURANCE NICHOLAS CHANDLER
                                ROGERS
ATTORNEYS FOR APPELLEES:        JESSIE WAYNE DOSS JR.
                                DAVID D. O'DONNELL
NATURE OF THE CASE:             CIVIL - OTHER
DISPOSITION:                    AFFIRMED - 02/18/2025
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     William Brand owned a residence in the Meadow Lake Park subdivision in Tupelo, Mississippi. Brand entered a lease with 1st Step Sober Living LLC (1st Step) for the home to be used by individuals recovering from substance abuse disorder. Residents of the subdivision filed a complaint in the Lee County Chancery Court requesting temporary and permanent injunctive relief as well as damages. The complaint alleged that the intended use of the residence violated restrictive covenants in place requiring the home to be used for residential purposes. 1st Step argued against the injunction, contending that (1) the Fair

Housing Act (FHA), 42 U.S.C. §§ 3601–3619, prevented the residents from discriminating against recovering drug users and (2) the house would not be operated as a business, meaning it did not violate the restrictive covenants. The chancellor granted the residents' request for injunctive relief and prevented the home from opening. Aggrieved, 1st Step appeals. The property was sold to uninterested parties during the course of this appeal. The City of Tupelo filed a motion with the supreme court to supplement the record with the warranty deed evidencing the sale and asserted the sale made this appeal moot. The supreme court passed the motion to this Court to be considered with the merits of the appeal. Upon review, we grant the motion for supplementation but disagree the case is moot, as 1st Step requested damages and raised issues under the FHA. However, after a review of the issues raised in this appeal, we affirm the ruling of the chancery court.

## FACTUAL AND PROCEDURAL HISTORY

¶2. William Brand owned a residence—a single home with three bedrooms and two bathrooms—in the Meadow Lake Park Subdivision in Tupelo, Mississippi.[1] The subdivision had restrictive covenants in place as follows:

> 2. Land Use and Building Type: This lot shall be used **only for private residential purposes**. No building shall be constructed or altered on the lot except one detached single-family dwelling. However, such building may have attached thereto (or separately constructed) a garage or automobile carport and servants quarters, provided that any such separate quarters shall never be used or occupied by anyone other than an actual bona fide servant of the principal dwelling.
>
> . . . .

---

[1] The specific address for the residence at issue is 4646 Meadow Lake Drive.

6.     Non-Conforming Uses and Nuisances: This lot or any portion thereof shall not be put to any use, except as permitted by these covenants, and no noxious or offensive activity shall be undertaken or carried on upon any lot which may become an annoyance to the neighborhood.

. . . .

10.     Enforcement: **Enforcement of these covenants may be undertaken by a proceeding at law or in equity, by the owner of any one or more of the lots in said subdivision**, against any person or persons violating or attempting to violate any one of more of said covenants. Any requirement that any such litigation shall be considered as class litigation, for the use and benefit of all of the owners of said lots, shall be and the same is hereby waived. Such litigation may be to restrain or enjoin violation or to recover money damages.

(Emphasis added). It appears Brand rented the property to Patrick Elkins from approximately 2017 to 2020. During that time, Elkins developed plans with Scott Smith, who owned 1st Step, to use the residence as a sober living home. Brand orally agreed to lease the residence to 1st Step and the company's members[2] (collectively referred to hereafter as "1st Step"), but no written lease was formed.[3] 1st Step planned to open the home on October 1, 2020, and operate as a sober living home for people with substance use disorders. At that time, 1st Step had eight prospective tenants who were expected to move into the home once it was opened.

¶3.     As of August 2020, 1st Step had not yet applied to the City of Tupelo for approval of their proposed use of the residence. The city attorney contacted Smith the following month and later sent a letter on September 22, 2020, captioned, "Notice of failure to comply with city ordinances and codes at 4646 Meadow Lake Drive[.]"

_____

[2] Those members included in the suit were Scott Smith, the chief executive officer, and Patrick Elkins, the chief operations officer.

[3] There is no dispute that no written lease was executed.

¶4. On September 23, 2020, Bill Cleveland and 105 other residents of the subdivision (collectively referred to as "the residents") filed a complaint in the Lee County Chancery Court against Brand, Smith, Elkins, 1st Step Sober Living LLC, and the City of Tupelo. The residents contended that the intended use of the property was in violation of the subdivision's restrictive covenants—specifically that the property "be used only for private residential purposes." Attached to the complaint were 1st Step's LLC certification and an application and handbook for prospective 1st Step tenants. In addition, the subdivision residents filed a motion for a temporary restraining order or, in the alternative, a preliminary and permanent injunction to prevent the sober living home from opening.

¶5. On September 24, 2020, the chancellor entered an order stating that a hearing was held that day during which 1st Step "announced an agreement to maintain the status quo" of the property at issue "until further order of the [c]ourt."[4] On September 30, 2020, 1st Step filed a response to the motion and an answer to the complaint. 1st Step also filed a counterclaim against the residents for "refusing to make reasonable accommodations in their rules, policies, practices, or services[,]" therefore violating the FHA. On November 2, 2020, 1st Step filed a motion to vacate the order maintaining the "status quo" and for other relief.

¶6. On October 13, 2021, 1st Step filed a motion for leave to file an amended counterclaim and cross-claim. After receiving responses from the residents and the City, the chancellor set a hearing on the motion in November 2021. Following the hearing, the chancellor granted 1st Step leave to file an amended complaint. On December 13, 2021, the

---

[4] Also on September 24, 2020, the chancellor entered an order of recusal and reassignment of the case.

chancellor entered an agreed scheduling order outlining the proceedings moving forward.

¶7. On December 14, 2021, 1st Step filed their first cross-claim against the City of Tupelo and their amended counterclaim against the residents. The cross-claim asserted that the City had also violated the FHA. The City responded to the claim on January 7, 2022. On March 10, 2022, 1st Step filed a motion for sanctions and default judgment against the residents and the City for failing to respond to requests for production of documents and interrogatories. A hearing on the motion was held on April 19, 2022. On the following day, the chancellor entered an order resetting the deadlines for the case and imposing a $500 sanction on the residents. On July 8, 2022, the residents filed an answer to 1st Step's amended counterclaim.

¶8. On August 2, 2022, 1st Step and its members filed a motion for partial summary judgment, again arguing the grounds of an FHA claim. The same day, 1st Step filed an additional motion for sanctions and an amended motion for partial summary judgment. Also on the same day, the residents filed a motion for summary judgment issuing declaratory relief and a permanent injunction against 1st Step and the City. Finally, on August 2, 2022, the City filed its own motion for summary judgment. On September 19, 2022, the chancellor denied all motions for summary judgment.

¶9. A bench trial was held from October 5 to October 7, 2022. At trial, it was established that the residence at issue would "be occupied by eight adult male participants in the 1st Step sober-living program, who will be supervised by a . . . [h]ouse [m]anager" who would also live in the home. The participants would be required "to pay a $650 monthly fee in exchange for living accommodations, random drug testing, required attendance at relapse meetings,

5

and general support, accountability, and counseling" from the house manager. An expert witness testified for 1st Step at trial to explain those services. At the conclusion of the trial, the chancellor granted the parties time to file post-trial briefs. Post-trial briefs were filed with the chancery court by the residents, 1st Step, and the City of Tupelo between December 2022 and January 2023 for additional review.

¶10. On May 2, 2023, the chancellor summarized his findings from the bench trial and review of the briefs and entered the final judgment in the cause. He found that "[w]hile there may be a residential aspect to 1st Step's business model[,] . . . it [was] clear that 1st Step's **business** model involve[d] more than providing a place to eat, sleep, and bathe, and that its primary purpose [wa]s to provide alcohol and drug recovery services for" its tenants. (Emphasis added). In addition, the chancellor noted that while the residence's "fair rental value . . . [wa]s approximately $1100 monthly[,]" 1st Step would be "generat[ing] approximately $5200 monthly in collections . . . which [wa]s reflective of the provision of additional services provided at the site." He reasoned that were the residence to be used only "as a place of abode," then the rental for each occupant would be lower "based on the fair market rental of the property[.]" The chancellor concluded that "the combination of obligations and services to be coordinated between 1st Step and its prospective tenants would violate the subject [r]estrictive [c]ovenants regarding its use only for private residential purposes." In addition, the chancellor denied 1st Step's requests for relief under the FHA.

¶11. On May 23, 2023, 1st Step appealed. On appeal, 1st Step asserts that (1) its use of the residence would not violate the subdivision's restrictive covenants, (2) the arrangement

would not violate the Mississippi Residential Landlord Tenant Act, (3) there should have been opportunity for reasonable accommodations to be made, and (4) not allowing 1st Step to operate within the residence violated the FHA.

¶12.    On April 11, 2024, the City of Tupelo filed a motion in the supreme court to supplement the record with a warranty deed evidencing the sale of the subject property, arguing the sale rendered the case moot. The deed indicated Brand sold the property to Scott Smith on June 2, 2023. However, on October 29, 2023, Smith then sold the property to Cristhoper Mendoza Gonzalez[5] and Juana Elizabeth Ortiz Ruiz. The deeds were certified and filed in Lee County's official land records. On April 12, 2024, the subdivision's residents filed a motion for joinder in the City's motion. On April 24, 2024, the Supreme Court passed both motions for consideration with the merits of the appeal. The case was then assigned to this Court.

## STANDARD OF REVIEW

¶13.    We "will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." *Ruff v. Est. of Ruff*, 989 So. 2d 366, 369 (¶11) (Miss. 2008) (quoting *Biglane v. Under The Hill Corp.*, 949 So. 2d 9, 13-14 (¶17) (Miss. 2007)). "Where the chancellor makes no specific findings, [we] proceed[] on the assumption that the chancellor resolved all fact issues in favor of the appellee." *Id.* (citing *City of Picayune v. S. Reg'l Corp.*, 916 So. 2d

---

    [5]  Cristhoper's name varies in spelling in the motion to supplement and attached documents. We use the spelling found on the warranty deed to the property.

510, 519 (¶22) (Miss. 2005)).

## ANALYSIS

¶14.    This Court has previously dismissed appeals as moot when facts proving mootness became available after the notice of appeal was filed, and we have allowed the record to be supplemented when mootness has been raised.  *See Williams v. State*, 228 So. 3d 381, 382 (¶¶1-4) (Miss. Ct. App. 2017) (dismissing appeal after defendant asked this Court "to revisit the question whether incest is a sex crime" while MDOC argued his post-release supervision mooted the appeal); *see also Lafayette Cnty. Bd. of Sup'rs v. Third Cir. Drug Ct.*, 80 So. 3d 785, 788 (¶¶12-15) (Miss. 2012) (dismissing appeal as moot after parties filed supplemental briefs stating Union County "replaced" Lafayette County as the "lead county" for the drug court).  After review, we grant the motion to supplement the record with the warranty deed.

### I.    Mootness

¶15.    The City and the residents assert that the sale of the residence at the center of this dispute renders the case moot.  Indeed, "[t]he appellate courts do not adjudicate questions that are moot." *In re Caldwell*, 326 So. 3d 503, 504 (¶4) (Miss. Ct. App. 2021) (citing *Davis v. Guido*, 308 So. 3d 874, 882 (¶29) (Miss. Ct. App. 2020)).  "A case is moot if a judgment on the merits would be of no practical benefit to the plaintiff or detriment to the defendant." *In re City of Biloxi*, 113 So. 3d 565, 572 (¶21) (Miss. 2013) (quoting *Gartrell v. Gartrell*, 936 So. 2d 915, 916 (¶8) (Miss. 2006)).  Our appellate courts generally "will dismiss an appeal **when no useful purpose could be accomplished by entertaining it**, when so far as concerns any practical ends to be served the decision upon the legal questions involved

8

would be merely academic." *Id.* (emphasis added) (quoting *Koestler v. Koestler*, 976 So. 2d 372, 379 (¶19) (Miss. Ct. App. 2008)). "[A] case is deemed moot where an **actual controversy existed at trial but has expired at the time of review**[.]" *Id.* (emphasis added) (quoting *Davis*, 308 So. 3d at 882 (¶29)).

¶16.    We note that there are exceptions to the mootness doctrine, including the public interest exception;[6] regardless, this Court finds the sale of the subject property did not render all the issues of 1st Step's proposed use of the property moot, as explained below. In this case, 1st Step also sought actual and punitive damages in their counterclaim when the restrictive covenant was sought to be enforced. Federal district courts have stated that "[c]laims for damages are largely able to avoid mootness challenges." *Ermold v. Davis*, 855

---

[6]    The mootness doctrine "will not be applied when the question or questions involved are matters affecting the public interest." *In re Validation of Tax Anticipation Note, Series 2014*, 187 So. 3d 1025, 1033 (¶22) (Miss. 2016) (quoting *Sartin v. Barlow*, 196 Miss. 159, 16 So. 2d 372, 376 (1944)). In other words, this exception arises "when the question concerns a matter of such a nature that it would be distinctly detrimental to the public interest that there should be a failure by the dismissal to declare and enforce a rule for future conduct." *Id.* This state's appellate courts have utilized the public interest exception in a variety of cases. *See Allred v. Webb*, 641 So. 2d 1218, 1220 (Miss. 1994) (finding a dispute concerning whether a DA could fire an ADA at his own discretion was not moot when the DA lost re-election while the case was still pending because it was "clearly not a mere private dispute between two parties since future district attorneys inevitably will find themselves in the same quandary"); *Alford v. Miss. Div. of Medicaid*, 30 So. 3d 1212, 1214 (¶9) (Miss. 2010) (finding a wife's petition to consider her husband's disability to increase certain allowances within the Medicaid program before applying to the program was not moot following the husband's death because the issue fell under the public interest exception "[a]s our current population continues to age and our state's coffers become more strained"); *Smith v. State*, 229 So. 3d 178, 181 (¶7) (Miss. Ct. App. 2017) (defendant's petition to be transferred from the state hospital was not moot even after his release because "the possible conflict regarding which court has jurisdiction under the circumstances" was in the public's interest). This opinion does not address the public interest exception to mootness. The FHA damages alleged by 1st Step as a result of the enforcement of the restrictive covenant survive the sale. *See supra* ¶16.

F.3d 715, 719 (6th Cir. 2017) (citing 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3553.3 (3d ed. 2017)); *see also CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 622 (3d Cir. 2013) ("[D]amages should be denied on the merits, not on grounds of mootness." (quoting *Nat'l Iranian Oil Co. v. Mapco Int'l Inc.*, 983 F.2d 485 (3d Cir. 1992))); *see also Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 8 (1978) (finding the appellees' "claim for actual and punitive damages arising from" actions of the appellant "saves this cause from the bar of mootness" (citing *Powell v. McCormack*, 395 U.S. 486, 496-500 (1969))).

## II.    Restrictive Covenants

¶17.    1st Step's argument essentially revolves around the restrictive covenants in the Meadow Lake Park subdivision.  Foremost, it is true that "[r]estrictive covenants are not favored in law[.]" *Timber Lake Foods Inc. v. Estess*, 72 So. 3d 521, 525 (¶12) (Miss. Ct. App. 2011) (quoting *Texas Rd. Boring Co. of La.-Miss. v. Parker*, 194 So. 2d 885, 889 (Miss. 1967)).  "But they are valid unless unreasonable, and when reasonable, the courts will not hesitate to hold the parties to their contracts." *Id.* (citing *Frierson v. Sheppard Bldg. Supply Co.*, 247 Miss. 157, 172, 154 So. 2d 151, 156 (1963)).

¶18.    Here, however, it is not the *validity* of the restrictive covenant that is at issue.  Rather, 1st Step argues its proposed use of the residence is within the confines of the restrictive covenant, and the residents disagree.  Consequently, this Court must determine whether the proposed use of the residence as a sober living home for individuals recovering from substance-use disorders falls within a "private residential purpose."  If the answer to this

10

question is no, then that is dispositive to the outcome of the entire case on appeal.

¶19.	The Mississippi Supreme Court handled a similar issue in *Scioto Properties SP-16 LLC v. Graf*, 349 So. 3d 172 (Miss. 2022). Scioto Properties was a "for-profit limited-liability company . . . specializ[ing] in helping individuals with developmental and/or physical disabilities to find residential housing." *Id.* at 174 (¶5). The company purchased a residence in a Tupelo subdivision and "agreed to abide by any and all protective covenants" when signing the express warranty deed. *Id.* Of note, one of the covenants expressly specified that "[o]nly one single family residence shall be constructed or permitted on each lot and it shall be used for residence purposes only." *Id.* at (¶7). In 2017, Scioto leased the residence to Brandi's Hope, "a for-profit Mississippi limited-liability company that provide[d] services to individuals with developmental and/or physical disabilities[.]" *Id.* at (¶8).

¶20.	Brandi's Hope subleased the residence to four separate individuals for "separate private bedrooms" and the right to use the home's common areas. *Id.* at (¶9). The individuals were disabled and, as part of their lease agreement, "agreed to exclusively use Brandi's Hope's residential support services" including those that involved getting dressed and completing day-to-day tasks. *Id.* at (¶10). These services also included employees who "provided around-the-clock care, taking turns tending to clients overnight." *Id.* The "subleases acknowledged that all individuals have a choice in the provider of all services" but mandated that individuals living in the home use Brandi's Hope's services. *Id.* at (¶11).

¶21.	The owners of the residence across the street filed a complaint against both Scioto and

Brandi's Hope, alleging that the residence "was being used for business purposes, which violated the protective covenants." *Id.* at (¶13). The chancellor agreed, and Scioto appealed to the Mississippi Supreme Court. *Id.* at 173 (¶1). The court held that "the covenants clearly and unambiguously express the intent to prohibit commercial use of the property." *Id.* at 174 (¶7). Further, it was undisputed that "Brandi's Hope d[id] not merely come to the home to provide services" but, rather, was "a business that leases the home for the express purpose of providing residential home services for which it is paid." *Id.* at (¶3).

¶22. Here, the prospective use of the property was exactly like the use declared a "business" by the supreme court's decision in *Scioto*. It is obvious that 1st Step's sober living home was a for-profit business. Testimony given at the bench trial as well as the testimony contained in the briefings and documents support this fact. We agree with the residents' brief that the "primary draw" for prospective tenants was not the home itself. Instead, that draw was "the services that [1st Step] plan[ned] to offer, including access to clinical support, supervision and basic life skill coaching by a house manager, drug testing, and employment recommendations to its tenants." The tenants were paying to live in the home to receive those services. Such services are certainly meritorious but as stated in *Scioto*, "these residential purposes cannot be unlinked from the commercial purpose of [1st Step]'s venture." *Id.* at 179 (¶34). We find that the proposed use of the residence was indeed a commercial endeavor and, similarly to the Mississippi Supreme Court's holding in *Scioto*, was prohibited by the restrictive covenants. *Id.* at (¶¶34-37).

## III. FHA

12

¶23.   1st Step also asserts they are entitled to damages because the residents and City violated the FHA, 42 U.S.C. § 3604, by "discriminating" against potential tenants of the sober living home. The threshold requirement here was the question of whether the potential tenants of 1st Step were handicapped and, thus, a protected group under the FHA. In relevant part, the chancellor's final judgment in this case determined that "taking into account the totality of credible proof, Brand and 1st Step have failed to satisfy the threshold requirement in 42 U.S.C.A. § 3602(h) to invoke the protections of the FHA." The chancellor gave the following reasoning for such a finding:

> No potential applicants testified. The application omits crucial information necessary to ascertain the applicant's deficiencies regarding major life activities or to determine whether any exclusions apply. Further, the manner in which those applications would be assessed to determine admission generates considerable uncertainty. Based on the testimony at trial, the admissions process appears to operate with such subjectivity that it was unpersuasive that appropriate criteria and assessment will be maintained to ensure its compliance and continued adherence to the directives which would offer protection under the FHA.

¶24.   In relevant part, "[t]he FHA makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap[.]" *Oxford House Inc. v. City of Baton Rouge*, 932 F. Supp. 2d 683, 687-88 (M.D. La. 2013) (quoting 42 U.S.C. § 3604(f)(1)).

¶25.   The FHA defines a handicap as "(1) a **physical** or **mental impairment which substantially limits** one or more of such person's major life activities, (2) a record of having such impairment, or (3) being regarded as having such an impairment." *Id.* at 688 (emphasis

13

added) (quoting 42 U.S.C. § 3602(h)). **This definition does not, however, "include current, illegal use of or addiction to a controlled substance**." *Id.* (emphasis added). "Alcoholism and drug-addiction are impairments, *see*, *e.g.*, *Reg'l Econ. Cmty. Action Program Inc. v. City of Middletown*, 294 F.3d 35, 46 (2d Cir. 2002)[, but] the FHA 'does not include current, illegal use of, or addiction to, a controlled substance,' 42 U.S.C. § 3602(h). Therefore, a recovering alcoholic, or an individual recovering from drug addiction, i.e., not currently using illegal drugs, **may** be handicapped under the FHA if his alcoholism or addiction **substantially limits** one or more of his major life activities." *Harmony Haus Westlake L.L.C. v. Parkstone Prop. Owners Ass'n*, 851 F. App'x 461, 463 (5th Cir. 2021).

¶26. To prevail on its FHA claim, 1st Step first needed to prove that its tenants were handicapped. *Chavez v. Aber*, 122 F. Supp. 3d 581, 595 (W.D. Tex. 2015) (quoting *DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006)). However, 1st Step presented little to no proof of such handicap to the chancellor. When 1st Step's CEO Scott Smith was called to testify during the hearing, the following exchange took place between counsel for the residents and himself:

> Q: So what sort of answers are you looking for when you're reviewing these applications in order to determine whether someone is under a substance use disorder?
>
> [SMITH]: Well, I mean, first, let me just say that the people coming to our house will be coming directly from substance use disorder treatment, so they will already be diagnosed with substance use disorder through the treatment facility, which is why they come to us in the first place, so that's already done.
>
> Q: Is that a requirement under the application?

14

[SMITH]: That is a -- no, **it won't be a requirement**, but if somebody comes to us, we are going to, you know, request that they identify as an alcoholic, or an addict, which is, basically, what the 12-step rooms you know, I told you we were abstinence based, and we run off the principles of the 12 steps, so **if someone identifies as an alcoholic, or an addict, we are going to accept that as true.**

Q: So you'll accept as true the statement by these folks that they are under a substance use disorder; correct?

[SMITH]: Correct.

Q: And you're **not going to corroborate that in any way**, are you?

[SMITH]: Not unless I'm suspicious of them not being honest about that.

(Emphasis added).

¶27. 1st Step itself was not absolutely sure whether its tenants were handicapped, and without more, the chancellor could not have found a handicap under the FHA. None of the potential tenants of 1st Step offered testimony. The application for entry into 1st Step merely asked for the applicant to list his or her addiction and "drug(s) of choice[.]" Medical records were not required for entry. Further, the application did not include any questions or sections ascertaining whether the applicant's major life activities were "substantially limit[ed]." The only step beyond filling out an application was an "interview with the house manager[,]" who was only required to be trained to know CPR and how to administer Narcan. In short, we agree with the chancellor that 1st Step did not provide support for or sufficiently prove that the tenants of the proposed rehabilitation business fit the "handicap" criteria as set out in the FHA.

15

**CONCLUSION**

¶28.    In summary, this Court grants the City's joint motion with the residents of Meadow Lake Park subdivision to supplement the record on appeal with the warranty deeds evidencing the sale of the subject property.  However, we do not find this appeal is moot due to the assertion of damages under issues raised in this appeal.  We find 1st Step was indeed a business endeavor and subject to prohibition by the restrictive covenants.  Further, we find that 1st Step failed to prove its tenants were "handicapped" as defined by the FHA.  Accordingly, we affirm the chancery court's final judgment.

¶29.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**